and I'd like to reserve five minutes for rebuttal. The first issue I'd like to address and the most important issue I'd like to address is the breach of the plea agreement in this case, because obviously we don't have to even get to the issue of the loss. We can't get to the issue of the loss unless the court determines that the plea agreement was breached, and if the plea agreement was breached, obviously the case has to be remanded for resentencing, and under the law in this circuit, it would be remanded for general resentencing so the district court would have the ability to readdress the loss issues, and it will be able to readdress the loss issues, hopefully, after the Hickey trial has occurred and there are harder and better facts to deal with the issue of loss in this case. Tell us what provision of the plea agreement was breached. There are three separate provisions of the plea agreement that were breached, Your Honor. The first part was the plea agreement clearly said that the government agreed not to oppose an adjustment for acceptance of responsibility based upon information known to it at the time. At the time, the government knew that Ms. Tang had a psychiatric problem. The government knew that that's established two separate ways. In the actual plea colloquy, people talk about Ms. Tang's psychiatric problems. In the declaration of Paul Wolfe, Paul Wolfe indicates that he spoke to the U.S. Did the government know that she had laundered money? Your Honor, there's no proof in the record that she has laundered money. That issue has never been addressed. What happened in this case was that Ms. Tang did in fact receive several checks from an entity separate from Mr. Hickey while this case was going on for accounting work. The government knew that she got that money. There's no proof that that was laundered. It's clear that she got money. The government has made unsubstantiated allegations that that was laundered money, and the district court refused to conclude that that was laundered money. So the facts are that Ms. Tang received money for accounting services from an entity associated with John Hickey, not from Mr. Hickey himself. It's always been up there. It's always been up front, but there's no proof that that money was laundered. Didn't the district court grant the departure? Yes, it did, Your Honor. But what Ms. Tang Adjustment? Yes. But what Ms. Tang bargained for was not the downward departure. This wasn't an 11C1C sentence or an 11E1C at the time. It was a bargain for a recommendation. And that's an important difference because when someone's standing up at sentencing, it's like arguing to this court. You have a limited amount of time to make the arguments that you have to make. And when someone, when you have a defendant standing in court, if you have to, if you're forced to waste your time making one argument, you have to waste your time on that argument, and you can't go on to other arguments. And in the give and take of a trial court level, sometimes the judge will say, well, yes, I'll give you this. I won't give you this. Did she get the benefit of her bargain? She did not get the benefit of her bargain because she bargained for the recommendation. She didn't bargain for the downward departure. That's a very different thing. She got – and the case law in this circuit is clear that a plea agreement, you're entitled to what you bargained for. And in this case, she bargained for the recommendation. She didn't get the recommendation. If the harm, then, is that you expended resources arguing for the adjustment that you didn't think you were going to have to argue for, and that precluded you from making other arguments, how do we judge the harm here? You judge the harm here because – Is it a per se rule? I think it is a per se rule. Because she didn't get the recommendation, not the adjustment, but the recommendation. Yes. And you spent time in arguing to the judge, and that's going to be just a – that's going to be a flat per se error. In – if I had a different case, I would strongly argue for a per se error. But I don't think you have to go to per se in this case because there were two other separate – there were two other breaches by the government in this case. I'll tell you about this one. All right. Where's the prejudice? The prejudice is the expansion of time forced to concentrate on something to the detriment of the ability to concentrate on other issues. Particularly when you look at the transcript of the sentencing in this case, there were a lot of issues that the district court had to decide. And the district court was pressed for time, didn't want to decide all of the various issues that were out there, so said, well, we don't have to spend time on this. But the district court was concerned about the acceptance of responsibility issue. And the district court ultimately, in its essence, threw a bone to the defense, decided to give the defense the acceptance of responsibility issue. I know this is not our case here, but let's suppose there is a provision in the plea agreement that requires the government to argue for a downward adjustment. And at the time of sentencing, the government gets up and says, we can't make that argument, and we declined to make that argument, and here's why. And the court listens to the government and then listens to you and says, you know what, I agree with defense counsel. There's no excuse for not making this recommendation. It should have been made, and I'm going to grant the adjustment. And let's say that takes 20 minutes of argument time. Where's the prejudice there? The prejudice there is because it takes time. But there's a procedure that the district court could follow in that case. If the government says that we want to get out of our recommendation that we bargained for, the government could have a separate hearing. They could say, we want to get out of this recommendation. There's a material change in the plea agreement. We want to have a change to see if we can be discharged from our obligation under the plea agreement. So you could have a hearing. There's a hearing on whether the government's forced to comply with the plea agreement or not, and then the judge could say, yes, they will comply, no, they won't comply, and then either on a different day or later, there could be a hearing on the sentencing. But it's a completely separate issue as to whether the government has to comply with the terms of the plea agreement. What's the other breaches? The other breaches. What are the other breaches? The other breaches, there are two other breaches. The first is the use of Ms. Tang's statements against her. She introduced them. She introduced them, but she introduced them only as an example of the prejudice in this case to show that she had accepted responsibility. If the government hadn't argued that she hadn't accepted responsibility, she would not have had to introduce those statements. So her having to introduce those statements demonstrates just how prejudicial it was that the government breached its obligation to reject the acceptance of responsibility. Secondarily, there wasn't a knowing and intelligent waiver of her rights under the plea agreement to not have her statements used against her. Under the plea agreement, it didn't say that the government can't, the government is flatly forbidden from using the statements against her. It doesn't say if you introduce them for purpose A, we can use them for purpose B. That's not what it says. The plea agreement says they can't use her statements against her, and they did. So that was a separate breach. In addition, the record indicates that the government additionally breached the plea agreement by using evidence of a Valley Forge case against Ms. Tang, and that was something the plea agreement also forbade them from using. So the government breached the plea agreement in two ways, by using the statements about Valley Forge and by using her debriefings against her. And finally, the third breach was the termination of her opportunity to cooperate. In this case, Ms. Tang bargained, she gave up her right to go to trial, she gave up all of her trial rights for an opportunity to cooperate. The government says, well, we have the right to unilaterally terminate that opportunity and stop Ms. Tang from cooperating. And the government says, well, there's an integration clause in the plea agreement, and therefore the plea agreement doesn't specify exactly how long that opportunity will go, so we have the right to unilaterally terminate that opportunity to cooperate two minutes after the plea agreement. One, that's an unreasonable reading of the plea agreement, and two, it's contradicted by the evidence in the record. You look at the declaration of Mike Ziegler, who was the U.S. attorney who negotiated the plea agreement at Excerpt of Record L, and Mr. Ziegler talks about how all the conditions in the plea agreement were reflected in the plea agreement itself and the colloquy. And the colloquy at the time of the plea, which is Exhibit D at page 21, indicates that the parties won't anticipate sentencing occurring until after the Hickey trial. So it's very clear that from the colloquy and from a reasonable interpretation of the plea agreement that all parties anticipated that Ms. Tang's opportunity to cooperate would be continuing. So the plea agreement was breached in three ways. The government said that she hadn't cooperated. I'm sorry, the government indicated that she had not accepted responsibility based upon her psychiatric condition. The government clearly knew about that condition at the time she entered her plea. The government used her statements against her. The government didn't have a right to do that, and she wouldn't have been forced to introduce those statements if the government hadn't argued against acceptance of responsibility. Finally, the government unilaterally terminated her opportunity to cooperate in clear contravention of what the government indicated she would do at the colloquy. No, no. Aren't we dealing with the question of fact that the trial court in this case resolved against you? No, Your Honor, because the government never – the government never sought to have the plea agreement set aside. This isn't a question of fact. No, as to whether or not there was a promise here to have Hickey tried before Ms. Tang was sentenced. The conditions of a plea agreement are reviewed de novo, Your Honor, and this Court has the right to review that de novo. Well, I thought that went to a question of credibility here, who's telling the truth. When I was rereading the briefs last night, Your Honor, and I was rereading the government's brief when they were talking about questions of credibility, I just kind of sat there and wondered if – I wasn't understanding what was going on because there weren't any credibility determinations for the district court to make. There was a declaration from Mr. Wolf, a declaration from Mr. Babcock, a declaration from Mr. Ziegler, and a declaration from Mr. Tang, but there was no hearing. There were no credibility determinations. The record before this Court is identical to the record before the district court. Well, she found, or the trial court found, as to whether there was a promise. And so you had to weigh the statements of the United States Attorney's Office with the declarations by her attorneys. And I have difficulty – I know you say that's a de novo thing, but actually somebody's got to ferret that out as a matter of fact. And in this case, the trial court found to the contrary, that there was no promise. I understand what you're saying, Your Honor, but it's my understanding of the law that the interpretation of the plea agreement is subject to de novo review by this court, and the question is whether there was a promise in the plea agreement and the colloquy is subject to de novo review by this court, so the district court's determination would not be binding upon this court. Well, there was no written agreement to that effect. This is all extrinsic. The plea agreement, Your Honor, was written, and the colloquy is a matter of record. Let's assume you get through the door. What's wrong with the loss calculation? The loss calculation is wrong for three reasons. One, it's based upon an assumption. It's really clear the district court said, I'm simply assuming that these are what the numbers are. Secondarily, she had a court-appointed expert, didn't she? No, Your Honor. What happened was there was parallel criminal and civil litigation in this case. In the civil litigation, Judge Alsup determined that there was an unjust enrichment amount of about $1.3 million. And significantly, when you look at the indictment in this case, paragraph 120 of the indictment only alleges that Ms. Tang embezzled about $1.5 million. The report that was done was prepared by a man by the name of Lee Bailey, and it's a classic garbage in, garbage out report. He basically says this investor contributed this amount of money, this investor got this amount of money out. It doesn't account for consequential damages. It doesn't account for collateral expenditures. It doesn't account for receiver's fees. It doesn't account for a whole bunch of things that aren't accounted for under the guidelines. So if, in fact, there's going to be a calculation of loss under the guidelines, people have to look and see what's the loss and what is the loss that Ms. Tang was responsible for. And I would say it's nothing, but I would say at worst it's the $1.3 million of unjust enrichment that Judge Alsup determined it to be. Sotomayor, isn't that your complaint that, faced with the choice of using unjust enrichment versus potential loss, she chose potential loss as opposed to unjust enrichment? No, Your Honor, because if the potential loss is the appropriate number if you have, let's say, some type of Ponzi scheme or some type of scheme where someone is trying to defraud people to get their money and put them in their pocket. What we have here is a failed real estate investment program, and lots of businesses fail for lots of reasons. Well, in this case, there was an assertion of net worth that was fabricated. Correct, but that had nothing to do with the failure of the business. That certainly aided Ms. Tang in raising the money, but that didn't contribute to the failure of the business. The business failed for a lot of reasons that businesses fail for. And when you look at the loss, you have to look at the loss either of what the person tried to get from the investors, which, you know, tried to fraudulently get from the investors, or the amount of unjust enrichment. And there's no indication under any circumstance that Ms. Tang was trying to defraud anybody of more than $20 million. Okay. Our questions have taken you over your time. We'll give you maybe half a minute or so for rebuttal. Thank you. I'll hear from the government at this time. Counsel? Good morning, Your Honors. Tim Crudeau for the United States. There's a reason they call it a loss calculation, and that's because the court is supposed to determine the loss, not the gain, to the defendant. And that's what the court did below. That was the correct methodology. That was the methodology that this court in a very similar case in Ortland, which also involved a failed real estate partnership that also in that particular case had developed some properties. And the court there said the loss is what the victims paid in and what they didn't get back. And that's the very same methodology that the district court applied in this case. I would also refer the court with respect to that methodology and why the disgorgement amount is incorrect to a very recent case in a related case in Hickey at 367 F. 3rd, 888, where the court addressed a similar argument and said in that particular case the disgorgement amount vis-a-vis Mr. Hickey was not, did not purport to determine the losses to investors. It's the loss to the investors. That's the methodology. Let me talk about the evidence supporting the correct methodology that the court used. The court did make some assumptions in reaching that figure between $10 million and $20 million. The assumptions were all in favor of the defendant. The assumptions were that Fund I conduct is not relative, not relevant to Fund II conduct, which was pleaded to. The court also assumed that not only was she going to give Ms. Tang the benefit of the amounts that were paid back to the investors prior to the fraud being uncovered, but she was also going to give them, give to her the benefit of the amounts that the receiver paid back after the fraud had been uncovered. So those were the assumptions that the court made. And the court had before it the, there was a court-appointed receiver in the related to the SEC action. The bally was submitted via the, from the receiver, calculated the amounts. Those were the very same amounts that were sat in the restitution calculation that's, that's in the record. Ms. Tang herself in the plea agreement admitted that she raised, through her misdeeds, over $15 million. That's a further data point that the court had before it to, to arrive at the calculation of about $12.25 million of loss. And that was substantial evidence that was supported by, by the record. It was not based on an assumption. In fact, every benefit was, was given to Ms. Tang. I want to turn now to, to the breach issues, because Your Honors are right. Without the breach, you don't even, you don't even get to the loss, the loss issue. Let me start with the first argument that the, Ms. Tang made here with respect to a breach, and that is a breach with respect to the, the adjustment. The government in the plea agreement agreed that based on the information that it knew at the time of the agreement, it would not oppose a two-level adjustment. And counsel said in his arguments that he was going to have to make the case for his client that she was entitled to that adjustment, even if the government had stood by and did not oppose, as it agreed under the agreement, not, did not oppose that adjustment. He was going to have to make whatever arguments that he was going to have to make. Roberts. This is not an adjustment or departure that requires an affirmative act by the government, correct? That's correct. And your argument is that the government could have satisfied its obligations under the plea agreement, putting aside the new information issues by simply remaining silent or saying, we have no opposition. That's correct. Paragraph 18 of the plea agreement says, based on the information now known to it, the government will not oppose the downward adjustment. So even with, without the opposition from the government. Did it make, did the government make any statement with respect to downward adjustment? It did at sentencing because the facts had very much changed by the time of sentencing. Your opponent says that was not new information. It certainly was new information, Your Honor. The information that he referred to with respect to Ms. Tang's mental state, that relates to a separate motion or a separate downward adjustment that was not part of the plea agreement that the Court denied. With respect to the two-level downward adjustment for acceptance of responsibility, a very large fact that was not known to the government at the time of the plea agreement was this $300,000 payment from Ms. Tang, from Mr. Hickey to Ms. Tang. And it was from Mr. Hickey, and we know that because Ms. Tang admitted to that in her papers at, in the record at Exhibit V at page 6, acknowledges that the payment was made to Ms. Tang from Mr. Hickey. This Court also found, in a prior appeal with respect to the $300,000 payment for these payments from Mr. – from the John Hickey brokerage, that that essentially, although did not technically comport with alter ego theory, Mr. Hickey controlled the John Hickey brokerage in every way. With respect to the government's knowledge of the payment, the arguments made below by counsel was that, well, the government is the SEC-slash-United States Attorney's office, and that's simply not the case. Whatever the SEC knew when it knew, it did. But the plea agreement defines the government very expressly, right at the beginning, as the United States Attorney's office and not any other local, state or Federal agency. So there is no, no evidence that certainly the government, the United States Attorney's office that was a party to this plea agreement, was not aware of that payment. There were also other facts that relate to Ms. Pang's acceptance of responsibility or lack thereof. She refused to meet with the probation officer. She refused to submit her financial information to probation. And, in fact, the probation department also recommended that no acceptance of responsibility adjustment be made as well, despite the fact that the Court went ahead and did that. So there was certainly a lot of information after that agreement. And I should also note that no objection was made to the government's position at sentencing. And to that extent, should the Court determine that this did constitute a preach, which obviously is not our position, would not be granted – certainly allow the What about the timing issue that your opponent raises? Let me address timing. Mr. Ziegler did tell the Court at the entry of the plea that the government didn't anticipate Ms. Pang being sentenced before the Hickey matter went to trial. He did, as a housekeeping matter, when the Court raised the issue of, okay, when are we going to schedule sentencing. You don't think a defendant's entitled to rely upon that? The defendants, if you look at the colloquy, all the discussion up to that point had been with the – with counsel, with the client, making sure she understood all her rights, making sure she understood the plea agreement. Her plea was entered by that time. There was a discussion of are there any other agreements except for what is set forth in this document, in this plea agreement, is there anything else that's out there that you have agreed to? Counsel raised one issue, not relevant here. Anything else, no. Ms. Tang, no. Okay. And then they accepted – the Court accepted the plea. They then turned to the housekeeping detail of – of the scheduling. In any event – in any event, the Court – No, when the government says something like that, people tend to rely upon it. And it certainly was the expectation of the government at the time that, I believe six months out, there would be – be a trial. And, again, the situation changed. But in – in any event, Has Hickey been tried? There is currently an August 30, 2004 trial date, Your Honor. I think so. Mr. Hickey had been up in front of this Court before, and it's set the timetable back. Okay. So – but we have the August 30 date. But in any event, the Court had before it the colloquy of counsel at the – at the change of plea, had before it the – all of the declarations of all the counsel involved, the declaration of Ms. Tang, had before it the plea agreement itself, which says nothing about Ms. Hickey's being able to delay her sentencing until after – Ms. Tang being able to delay her sentencing until after Mr. Hickey is tried, had all of that before her, came to the factual determination that that was not part of the agreement. No question. Your adversary says that's a question de novo. We – And not one of fact. We disagree, Your Honor. Certainly, the Court below found, as a matter of fact, that that was not part of the agreement, all of the declarations. And I think the case law says that while this Court reviews de novo the interpretation of do the facts, as the lower court found, breach the plea agreement as a matter of law, those facts that are – give rise to the purported breach, that is an issue of fact for the district court. Let me – One more? One more very briefly. The third purported breach, and that's the use of her statements, Ms. Tang's statements at trial, Ms. Tang certainly had a contractual right to bar the door, to keep the government from using evidence of her statements that she had made against her at the sentencing. That was her contractual right. In your position, as if she had never brought them up, the government would not have mentioned them? That's correct, Your Honor. That's correct. Had she not raised those, the – by her raising those, opened the door. But had she not done that, she would not have waived her right to do that. There was an argument made below that, separately, Ms. Tang breached the agreement, which relieved the government of any of its obligations. That is not – is not an issue that we have argued here, necessarily. Certainly, there would be another grounds that would permit the government to raise these issues, but we don't – that doesn't need to be decided today. She had the right. She waived it. She opened the door, and it was appropriate for the government to refer to the very statements that she had before the Court. Okay. Thank you, Your Honor. Thank you for your argument. There are 30 seconds of rebuttal. I'll try to talk faster, Your Honor, because I think it's really important. There are some factual inaccuracies. First, the government says that we didn't object to what happened – the government not recommending a downward departure. That's simply not true. In the reply to the U.S. Sentencing Memo at page 7, footnote 4, we objected. In addition, at Exhibit V, page 7, we indicate, while the government characterizes her conduct in those debriefings as a persistent state of denial, the debriefings speak for themselves and show a clear acceptance of responsibility for actions. Ms. Tang has accepted responsibility in writing, and the plea agreement states that the government will not oppose a two-level adjustment. So we're clearly telling the Court, this is what the plea agreement says. The government may not breach it. In addition, Your Honor, the government indicates on the loss issue that the loss – that this is the same calculation that the Court went through in U.S. v. Ortland. Ortland is a very different case, because what happened here – in this case, there was a receiver. We simply know that the receiver said, this amount of money was raised, this amount of money came back to the individuals. We don't know what happened in the meantime. We don't know where those funds went. We have no idea what Ms. Tang intended to take, and we have several judicial findings that she took – intended to take less than $1.5 million. And with that, I submit it, Your Honors. Roberts. Thank both counsel for your argument. The case just argued will be submitted, and the Court will stand in recess for the day. Thank you. Thank you both. This court will be set in recess. Thank you.
judges: Lay , Hawkins, Bybee